UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
LAFAYETTE DIVISION

| | |
|---|---|
| L. KURTZ-PORTER,<br>      Plaintiff,<br><br>      v.<br><br>KILOLO KIJ, Commissioner of<br>Social Security<br><br>      Defendant. | )<br>)<br>)<br>)   Case No. 4:20-CV-037-JD<br>)<br>)<br>)<br>)<br>)<br>) |

**OPINION AND ORDER**

     L. Kurtz-Porter applied for disability insurance benefits, alleging that she is unable to work primarily due to Raynaud's phenomenon, fibromyalgia, and chronic back pain. Ms. Kurtz-Porter was found to be not disabled in a March 2019 decision. Ms. Kurtz-Porter then filed this appeal, asking the Court to reverse the ALJ's decision and remand for further proceedings based on alleged errors with the residual functional capacity assessment. The Commissioner filed a response in opposition. Ms. Kurtz-Porter then filed her reply. As explained below, the Court remands the Commissioner's decision.

**I.    Factual Background**

     Until she stopped working, Ms. Kurtz-Porter worked as a nurse. (R. 44). Ms. Kurtz-Porter suffers from Raynaud's phenomenon, fibromyalgia, and chronic back pain. (R. 17). Ms. Kurtz-Porter applied for benefits in 2017. She alleges disability starting June 10, 2016, and she meets the insured status requirements of the Social Security Act through September 30, 2021. (R. 24). The ALJ issued an unfavorable decision on March 18, 2019. In that decision, the ALJ made the following residual functional capacity:

> [T]he claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except she can frequently climb ramps and stairs; can never

1

>climb ladders, ropes, or scaffolds; can frequently balance, stoop, kneel, crouch, and crawl; and must avoid concentrated exposure to unprotected heights, moving mechanical parts, extreme cold or extreme heat, or vibration.

(R. 27). Finding that Ms. Kurtz-Porter can perform other work in the economy, the ALJ found that she is not disabled. The Appeals Council declined review, and Ms. Kurtz-Porter filed this action seeking judicial review of the Commissioner's decision.

## II. Standard of Review

Because the Appeals Council denied review, the Court evaluates the ALJ's decision as the final word of the Commissioner of Social Security. *Schomas v. Colvin*, 732 F.3d 702, 707 (7th Cir. 2013). This Court will affirm the Commissioner's findings of fact and denial of benefits if they are supported by substantial evidence. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971). This evidence must be "more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). Even if "reasonable minds could differ" about the disability status of the claimant, the Court must affirm the Commissioner's decision as long as it is adequately supported. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

The ALJ has the duty to weigh the evidence, resolve material conflicts, make independent findings of fact, and dispose of the case accordingly. *Perales*, 402 U.S. at 399–400. In evaluating the ALJ's decision, the Court considers the entire administrative record but does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute the Court's own judgment for that of the Commissioner. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). Nevertheless, the Court conducts a "critical review of the evidence" before

affirming the Commissioner's decision. *Id.* An ALJ must evaluate both the evidence favoring the claimant as well as the evidence favoring the claim's rejection and may not ignore an entire line of evidence that is contrary to his or her findings. *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001). The ALJ must provide a "logical bridge" between the evidence and the conclusions. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009).

### III. Standard for Disability

Disability benefits are available only to those individuals who can establish disability under the terms of the Social Security Act. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). Specifically, the claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security regulations create a five-step process to determine whether the claimant qualifies as disabled. 20 C.F.R. §§ 404.1520(a)(4)(i)–(v); 416.920(a)(4)(i)–(v). The steps are to be used in the following order:

1. Whether the claimant is currently engaged in substantial gainful activity;
2. Whether the claimant has a medically severe impairment;
3. Whether the claimant's impairment meets or equals one listed in the regulations;
4. Whether the claimant can still perform past relevant work; and
5. Whether the claimant can perform other work in the community.

*See Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).

At step two, an impairment is severe if it significantly limits a claimant's ability to do basic work activities. 20 C.F.R. §§ 404.1522(a), 416.922(a). At step three, a claimant is deemed disabled if the ALJ determines that the claimant's impairment or combination of impairments

meets or equals an impairment listed in the regulations. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If not, the ALJ must then assess the claimant's residual functional capacity, which is defined as the most a person can do despite any physical and mental limitations that may affect what can be done in a work setting. 20 C.F.R. §§ 404.1545, 416.945. The ALJ uses the residual functional capacity to determine whether the claimant can perform his or her past work under step four and whether the claimant can perform other work in society at step five. 20 C.F.R. §§404.1520(e), 416.920(e). A claimant qualifies as disabled if he or she cannot perform such work. The claimant has the initial burden of proof at steps one through four, while the burden shifts to the Commissioner at step five to show that there are a significant number of jobs in the national economy that the claimant can perform. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).

**IV.    Discussion**

Ms. Kurtz-Porter offers two arguments in support of reversal. She argues that the ALJ failed to properly account for her Raynaud's phenomenon in the RFC, and that the ALJ erred in analyzing her pain and need for a cane. The Court only addresses Ms. Kurtz-Porter's first argument because it agrees that the ALJ failed to adequately support the RFC with substantial evidence, specifically with regard to her Raynaud's phenomenon, and finds that remand is required on that basis. The parties can address any remaining arguments on remand.

An ALJ is charged with determining an individual's RFC, meaning "what an individual can still do despite his or her limitations." SSR 96-8p. The ALJ makes that determination based upon medical evidence as well as other evidence, including testimony by the claimant. *Murphy v. Colvin*, 759 F.3d 811, 817 (7th Cir. 2014) (citation omitted). In making a proper RFC determination, an ALJ must consider all of the relevant evidence in the record, even evidence

relating to limitations that are not severe. *Id.*; see 20 C.F.R. § 404.1529(a). The ALJ must also "articulate in a rational manner the reasons for his assessment of a claimant's residual functional capacity," *Stewart v. Astrue*, 561 F.3d 679, 684 (7th Cir. 2009), in a way that builds "an accurate and logical bridge from the evidence to the conclusion." *Giles v. Astrue,* 483, 487 (7th Cir. 2007); *see Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005) (holding that an ALJ's failure to explain how they arrived at RFC conclusions, in itself, warrants reversal); SSR 96-8p at *7. Failure to meet those standards requires reversal. *See Stewart*, 561 F.3d at 684; *Giles* 483 F.3d at 487; *Briscoe*, 425 F.3d at 352.

Ms. Kurtz-Porter testified at the hearing that her Raynaud's phenomenon affects her hands, and that she struggled with typing and doing blood draws and IVs because she would "drop things" due to her Raynaud's. (R. 55). She further testified that although cold weather is a trigger, it is not the only trigger. (R. 55). She stated that stress is also a trigger, and that sometime "[i]t's just there." (R. 55-56). When asked who first diagnosed her Raynaud's phenomenon, Ms. Kurtz-Porter testified that she believed it was her pain management doctor, Dr. Lloyd. (R. 68). She stated that her hands start to turn purple, then white, and the sensation travels down her hands. (R. 69). She stated that the process starts with pain before her hands go numb, and that the process for her hands to return to normal is "even more painful" and "feels like pins and needles and tingling and fire." (R. 69). She stated that the entire sequence, from starting to change color to going back to normal, can take as little as five minutes if it's just two fingers, or longer if it's all of her fingers or her whole hands. (R. 69). She testified that this occurs several times a day, and that on the day of the hearing it had happened twice before 10:00 AM, and that her hands were "still completely white and cold and hurt" after fifty minutes. (R. 70).

In the medical record, the first indication of Raynaud's phenomenon is in a pain

management note from 2016 where it was listed as a diagnosis. (R. 416, 423). Raynaud's phenomenon is then listed regularly as a "present illness" in Ms. Kurtz-Porter's pain management notes. (R. 482, 495, 504, 514). In treatment notes from January 2018-October 2018, her physician stated that her symptoms were induced by cold and stress, and that she is experiencing symptoms. (R. 482, 495, 504, 514). Moreover, in September 2017, a physician noted diminished reflexes in the upper left wrist, and that sensation of the upper extremities was diminished to touch. (R. 442). This same physician also noted that Ms. Kurtz-Porter complained of dropping things. (R. 443).

      The ALJ found Ms. Kurtz-Porter's Raynaud's phenomenon to be a severe impairment at step 2. (R. 24). In the RFC the ALJ provided no limitations regarding fingering or handling, but he found that Ms. Kurtz-Porter "must avoid … extreme cold or extreme heat, or vibration." (R. 27). The ALJ then found that although Ms. Kurtz-Porter's physician noted her Raynaud's phenomenon as an active problem, he "did not indicate when this diagnosis was made, or by whom, nor did he actually observe any discoloration, weakness, or numbness in the hands." (R. 29). The ALJ further relied on her physician's findings that did not mention "any unusual weakness, fatigue, or difficulty using the hands through the close of the year. … and apparently normal sensation and use of the hands." (R. 29). The ALJ did note that one physician noted "diminished left wrist reflexes and diminished sensation in the upper extremities," (R. 30), but found that she had "completely normal neurologic findings and normal or else unremarkable use of the hands" apart from the previous note. (R. 30). Finally, the ALJ noted that the RFC's limitations to avoiding concentrated exposure to temperature extremes and vibration are due to her Raynaud's phenomenon. (R. 30).

      As an initial matter, the ALJ found that it is unclear when Ms. Kurtz-Porter was

diagnosed with Raynaud's phenomenon or which doctor diagnosed it. (R. 29). Knowing which doctor diagnosed her Raynaud's and when they diagnosed it is irrelevant to the disability determination. Ms. Kurtz-Porter's Raynaud's phenomenon is well documented in the record and accepted by her physicians, and therefore it is unimportant when she was diagnosed or which doctor diagnosed her, as it is listed as a diagnosis and an active problem after her alleged onset date. (R. 362, 366, 482, 495, 504, 514). Moreover, the ALJ himself found that Ms. Kurtz-Porter's Raynaud's phenomenon is a severe impairment, so it is unclear why the ALJ is concerned with when and by whom the Raynaud's was diagnosed. The ALJ's inclusion of this comment implies that the ALJ does not trust Ms. Kurtz-Porter's physician's report of her Raynaud's as an active or accurate diagnosis, which contradicts his finding that her Raynaud's is a severe impairment. While this comment alone is not enough to require remand, it defies logic and causes some concern.

More problematic, the ALJ relied on the fact that her primary physician did not note "any unusual weakness, fatigue, or difficulty using the hands," as well as" apparently normal sensation and use of the hands." (R. 29). However, the records that the ALJ cites to do not discuss Ms. Kurtz-Porter's hands at all, and instead focus on a checklist of general symptoms. (R. 419-20, 424-25). The treatment notes discussing Ms. Kurtz-Porter's Raynaud's phenomenon indicate cold and stress induced pallor, cold and stress induced pain, and cold and stress induced acrocyanosis (discoloration).[1] (R. 482, 495, 504, 514). Yet the ALJ does not discuss the treatment notes regarding Ms. Kurtz-Porter's Raynaud's symptoms or indicate her symptoms are triggered by both cold and stress. While the physician does not specifically find "unusual

---

[1] Acrocyanosis is bluish discoloration of the extremities caused by spasms of the small blood vessels within the skin, usually in response to cold or emotional stress. https://www.merckmanuals.com/home/heart-and-blood-vessel-disorders/peripheral-arterial-disease/acrocyanosis (last visited September 94, 2021).

weakness … or difficulty using hands," (R. 29), in the treatment notes cited by the ALJ, the physician specifically notes pain, pallor, and acrocyanosis. (R. 482, 495, 504, 514). He also notes "bad" fibromyalgia, fatigue, "worse" chronic fatigue, "worsened" myalgias, and that Ms. Kurtz-Porter "has been dropping things." (R. 481-82, 489, 494-95, 499, 503-04, 508, 518). The ALJ simply ignores the multiple treatment records indicating Ms. Kurtz-Porter was suffering with symptoms from her Raynaud's phenomenon. Instead, he relies on treatment notes that do not mention her hands at all, and therefore fit the ALJ's finding that the physician did not find "unusual weakness … or difficulty using hands," as the physician did not discuss her hands at all in those particular treatment notes. This amounts to impermissible cherry-picking of the evidence, as the ALJ relied on facts that support his finding of non-disability while ignoring evidence that runs contrary to this finding. *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010).

Moreover, Ms. Kurtz-Porter's orthopedic specialist found diminished left wrist reflexes and diminished sensation in her upper extremities. (R. 442). While the ALJ noted this finding, he still noted that her treatment providers "recorded completely normal neurologic findings and normal or else unremarkable use of the hands" apart from her orthopedic specialist's finding of diminished sensation and reflexes. (R. 30). Once again, the ALJ cites to treatment records that do not make any statement regarding Ms. Kurtz-Porter's hands. The ALJ is correct in stating they found no remarkable weakness, fatigue, sensory loss, or loss of dexterity in her hands (as they don't discuss her hands), but he ignores the physician's findings regarding diffuse pain, Raynaud's phenomenon specific symptoms, and her continued complaints of dropping things. (R. 481-82, 489, 494-95, 499, 503-04, 508, 518).

Finally, the ALJ's discussion of Ms. Kurtz-Porter's Raynaud's phenomenon and her complaints of pain, numbness, and dropping items displays the ALJ's misunderstanding of

8

Raynaud's phenomenon and how it is diagnosed and treated. The ALJ found that Ms. Kurtz-Porter had "completely normal neurological findings" and limited her to no exposure to extreme temperatures or vibrations. (R. 27, 30). However, Raynaud's phenomenon is not an impairment that shows abnormal neurological findings. Raynaud's is a rare disorder that effects the arteries, and it is marked by brief episodes of narrowing of the blood vessels (known as vasospasms).[2] There are two types of Raynaud's: primary Raynaud's (also called Raynaud's disease), where the cause of symptoms is unknown, and secondary Raynaud's (also called Raynaud's phenomenon), where the symptoms are caused by an underlying disease, condition, or other factor. *Id.* Raynaud's phenomenon, which is what Ms. Kurtz-Porter suffers from, is often "a more serious disorder" than Raynaud's disease.[3] Raynaud's can be triggered by both cold and stress, and even mild or brief temperature changes, such as taking something out of the freezer, washing your hands in cold water, or being exposed to temperatures below 60 degrees Fahrenheit, can trigger a Raynaud's attack.[4] Moreover, Raynaud's phenomenon frequently occurs in conjunction with fibromyalgia, and a 2016 study indicates that Raynaud's symptoms in fibromyalgia patients "may be caused by different mechanisms than those seen in primary [Raynaud's] or secondary to the autoimmune conditions."[5]

Neurological testing and findings will be normal in Raynaud's phenomenon, and there are very few ways to diagnose Raynaud's phenomenon.[6] Primary Raynaud's is often diagnosed

---

[2] https://www.nhlbi.nih.gov/health-topics-raynauds (visited September 27, 2021).
[3] https://my.clevelandclinic.org/health/diseases/9849-raynauds-phenomenon (visited September 27, 2021).
[4] https://www.nhlbi.nih.gov/health-topics-raynauds (visited September 27, 2021); www.fibromyalgia.techie.org/figromyalgia-and-raynauds-syndrome/ (visited September 27, 2021).
[5] M. Scolnik et al., *Symptoms of raynaud's phenomenon (RP) in fibromyalgia syndrome are similar to those reported in primary RP despite differences in objective assessment of digital microvascular function and morphology*, 36 RHEUMATOLOGY INTERNATIONAL 1371–1377 (2016).
[6] https://my.clevelandclinic.org/health/diseases/9849-raynauds-phenomenon (visited September 27, 2021); https://www.nhsinform.scot/illnesses-and-conditions/heart-and-blood-vessels/conditions/raynauds-phenomenon#diagnosing-raynaud-s-phenomenon (visited September 28, 2021).

solely by examination of symptoms, whereas Raynaud's phenomenon can also be diagnosed through a test called a nailfold capillaroscopy (an examination for abnormalities of the capillaries), as well as blood tests for other health conditions that may cause Raynaud's.[7] The ALJ's reliance on normal neurological findings to discount Ms. Kurtz-Porter's symptoms shows a misunderstanding in how Raynaud's is diagnosed and monitored.

The ALJ also states that there is no evidence that her physician ever observed any discoloration in her hands, (R. 29), yet Ms. Kurtz-Porter provided pictures in the record showing discoloration due to her Raynaud's phenomenon. (R. 569-572). The ALJ failed to consider the provided evidence of the discoloration in finding that her physician never explicitly mentioned observing discoloration. The physician documented her symptoms due to Raynaud's, and an explicit statement that the physician observed the discoloration changes is not necessary to corroborate Ms. Kurtz-Porter's symptoms.

The ALJ erred in providing some limitations related to Ms. Kurtz-Porter's Raynaud's phenomenon symptoms while ignoring others that were discussed by physicians. The ALJ failed to explain why he found that Ms. Kurtz-Porter should avoid temperature extremes, yet he provided no limitations regarding stress. Ms. Kurtz-Porter's physicians noted that both cold temperatures and stress were triggers for her Raynaud's phenomenon, and no doctor made any statements regarding vibrations. (R. 481-82, 489, 494-95, 499, 503-04, 508, 518). The ALJ has failed to explain how he determined that the RFC limitations to exposure from extreme temperatures and vibrations accommodates Ms. Kurtz-Porter's Raynaud's phenomenon when her physician stated stress also triggered Raynaud's attacks. Without such an explanation, the court

---

[7] https://my.clevelandclinic.org/health/diseases/9849-raynauds-phenomenon (visited September 27, 2021); https://www.nhsinform.scot/illnesses-and-conditions/heart-and-blood-vessels/conditions/raynauds-phenomenon#diagnosing-raynaud-s-phenomenon (visited September 28, 2021).

cannot follow the ALJ's reasoning. The ALJ may not play doctor and conjecture as to a claimant's limitations using his lay opinion of an impairment. *Blakes v. Barnhart*, 331 F.3d 565, 570 (7th Cir. 2003). On remand, the ALJ should explain what medical evidence was used in determining the RFC with regard to Ms. Kurtz-Porter's Raynaud's phenomenon.

Further, the ALJ erred in dismissing Ms. Kurtz-Porter's complaints of pain, numbness, and tingling based on normal neurological findings. Raynaud's phenomenon is diagnosed based on symptoms, which include numbness, tingling, swelling, and pain.[8] Ms. Kurtz-Porter does not allege that her Raynaud's means she always has decreased functional use of her hands; rather, she alleges that during Raynaud's attacks, she experiences difficulty with holding items and experiences pain, tingling, and numbness. (R. 55-56, 68-70). The ALJ seems to find that because her physicians did not regularly note decreased sensation or difficulty in using her hands during normal visits, that Ms. Kurtz-Porter must never experience decreased sensation or difficulty in using her hands, even during a Raynaud's attack. This is an inaccurate view of how Ms. Kurtz-Porter alleges her Raynaud's phenomenon affects her.

The ALJ erred in discussing Ms. Kurtz-Porter's Raynaud's phenomenon. On remand, the ALJ must properly weigh the evidence and make a full and proper analysis of Ms. Kurtz-Porter's Raynaud's phenomenon. Accordingly, the Court reverses and remands for additional proceedings. The parties are free to address any remaining issues on remand.

---

[8] https://www.mayoclinic.org/diseases-conditions/raynauds-disease/symptoms-causes/syc-20363571 (visited September 28, 2021).

## CONCLUSION

For those reasons, the Court REVERSES the Commissioner's decision and REMANDS for additional proceedings consistent with this opinion. The Clerk is DIRECTED to prepare a judgment for the Court's approval.

SO ORDERED.

ENTERED: October 5, 2021

/s/ JON E. DEGUILIO
Chief Judge
United States District Court
